UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                                    :
UNITED STATES OF AMERICA             :     **SEALED**
                                           **SUPERSEDING INDICTMENT**
              - v. -                 :
                                     :     S2 15 Cr. 616 (KBF)
DARCY WEDD,
FRASER THOMPSON,                     :
CHRISTOPHER GOFF,
MICHAEL PEARSE,                      :
YONGCHAO LIU,
   a/k/a "Kevin Liu,"                :
YONG JASON LEE,                            **ORIGINAL**
   a/k/a "Jason Lee,"                :
EUGENI TSVETNENKO,
   a/k/a "Zhenya,"                   :
FRANCIS ASSIFUAH,
   a/k/a "Francis Assif,"            :

              Defendants.            :

- - - - - - - - - - - - - - - x

## COUNT ONE

### (Conspiracy to Commit Wire Fraud and Mail Fraud)

The Grand Jury charges:

### Overview of the Fraud Scheme

1.    From at least in or about 2011, up through and
including in or about 2013, DARCY WEDD, FRASER THOMPSON, CHRISTOPHER
GOFF, MICHAEL PEARSE, YONGCHAO LIU, a/k/a "Kevin Liu," YONG JASON
LEE, a/k/a "Jason Lee," EUGENI TSVETNENKO, a/k/a "Zhenya," and
FRANCIS ASSIFUAH, a/k/a "Francis Assif," the defendants, and other
co-conspirators not named as defendants herein, engaged in a
multi-million dollar scheme to defraud mobile phone customers,

including customers in the Southern District of New York, by placing unauthorized charges for premium text messaging services on the consumers' cellular phone bills through a practice known as "auto-subscribing."

2. To carry out the auto-subscribing scheme, DARCY WEDD, FRASER THOMPSON, CHRISTOPHER GOFF, MICHAEL PEARSE, YONGCHAO LIU, a/k/a "Kevin Liu," YONG JASON LEE, a/k/a "Jason Lee," EUGENI TSVETNENKO, a/k/a "Zhenya," and FRANCIS ASSIFUAH, a/k/a "Francis Assif," the defendants, and other co-conspirators not named as defendants herein, caused unsolicited text messages to be sent to mobile phone users offering subscriptions to receive recurring text messages containing content such as horoscopes, celebrity gossip, or trivia facts. The mobile phone users who received the unsolicited text messages typically ignored or deleted the messages, often believing them to be spam. The victims of the fraud scheme never affirmed their interest in these services at any point. Nevertheless, these consumers were billed or "auto-subscribed" for these services, which were known in the industry as premium text messaging ("Premium SMS") services, at a rate of $9.99 per month, even though they had never ordered them. The $9.99 charge recurred each month unless and until consumers noticed the charges and took action to unsubscribe. Even then, consumers' attempts to dispute the charges and obtain refunds were often unsuccessful.

3. DARCY WEDD, FRASER THOMPSON, CHRISTOPHER GOFF, MICHAEL PEARSE, YONGCHAO LIU, a/k/a "Kevin Liu," YONG JASON LEE, a/k/a "Jason Lee," EUGENI TSVETNENKO, a/k/a "Zhenya," and FRANCIS ASSIFUAH, a/k/a "Francis Assif," the defendants, and other co-conspirators not named as defendants herein, also took steps to conceal the fraud scheme itself and their participation in the fraud scheme. For example, PEARSE and LIU developed a computer platform that could auto-subscribe consumers in a way that made it appear to the mobile phone carriers and industry compliance groups that the consumers had, in fact, validly authorized the subscriptions, when in truth, they had not. In addition, WEDD, THOMPSON, GOFF, PEARSE, TSVETNENKO, and ASSIFUAH distributed the proceeds of the fraud scheme among themselves and the other co-conspirators through a series of nominee companies and companies held in the name of third parties, and/or received payments in cash, in order to conceal the nature and source of the payments they received for their assistance with the fraud scheme.

4. The fraud scheme generated tens of millions of dollars in proceeds, which DARCY WEDD, FRASER THOMPSON, CHRISTOPHER GOFF, MICHAEL PEARSE, YONGCHAO LIU, a/k/a "Kevin Liu," YONG JASON LEE, a/k/a "Jason Lee," EUGENI TSVETNENKO, a/k/a "Zhenya," and FRANCIS ASSIFUAH, a/k/a "Francis Assif," the defendants, and other co-conspirators not named as defendants herein, apportioned among

themselves. Some of proceeds were used to fund a lavish lifestyle of, among other things, multi-million dollar homes, expensive vacations, and gambling.

## The Premium SMS Industry

5. Premium SMS services are subscription services that are marketed to mobile phone customers. Mobile phone customers who sign up for Premium SMS services typically pay a monthly fee to receive recurring text messages sent to their mobile phones. The text messages contain different content depending on the service offered. Common examples of the types of content offered by Premium SMS services include monthly horoscopes, celebrity gossip, or trivia facts.

6. In the Premium SMS industry, companies that offer Premium SMS services are often referred to as digital "content providers." Each service or "offer" that is marketed by a content provider is assigned a five or six digit number called a "short code."

7. Companies known as mobile "aggregators," serve as the middlemen between content providers and the mobile phone carriers. Aggregators have access to the carriers' billing infrastructure and it is their job to assemble, or "aggregate," all of the monthly charges incurred by a particular mobile phone customer for Premium SMS services onto that customer's phone bill. Content providers give the monthly billing data for their short codes to the

-4-

aggregators. The aggregators, in turn, place those charges on the appropriate mobile phone bills. The carriers then send out the bills containing the Premium SMS charges to the mobile phone customers and collect payment.

8. The carriers, the aggregators, and the content providers share the revenue generated by the Premium SMS subscriptions. The exact revenue split is determined by the particular agreements negotiated between the parties. Often the carriers can collect between 40%-50% of the revenue generated, the aggregators can collect between 25%-35%, and the content providers collect the remaining portion.

9. It is standard industry practice in the Premium SMS industry to require that consumers take two steps to confirm a purchase of a Premium SMS service. This practice is known as "double opt-in" verification. For example, a content provider typically advertises to consumers on Internet websites, and instructs them how to order the Premium SMS service. The consumer is usually asked to type his or her mobile phone number into the website (the first opt-in). The consumer then receives on a text message that typically contains a key word or PIN number, and which asks the consumer to confirm the opt-in to the subscription service (the "PIN Text"). The consumer must then reply to the text message with the key word or PIN number, or enter the key word or PIN number onto a website (the

second opt-in). Once the consumer has opted-in through the double opt-in process, the consumer is enrolled in the content provider's Premium SMS service and typically receives a second text message welcoming the consumer to the service (the "Welcome Text"). At that point, the charges will begin to appear on the consumer's mobile phone bill.

10. Before a content provider can begin marketing a particular Premium SMS service through its associated short code to mobile phone users – sometimes called a "short code campaign" – the short code campaign must first be reviewed and approved by the mobile telephone carriers for compliance with mobile industry marketing standards and practices. Mobile telephone carriers, mobile aggregators, and mobile industry compliance groups then monitor approved short code campaigns to ensure that they remain compliant by keeping track of certain data such as subscription rates, refund rates, and the number of customer complaints.

11. If the data collected about a particular short code campaign indicates that the campaign is non-compliant, the carriers and/or the compliance groups will often initiate an audit of the short code by requesting additional information from the aggregators to verify, among other things, that the subscriptions are the result of genuine double opt-in verification by the consumers. If the audit results indicate fraudulent or deceptive conduct or non-compliance

-6-

with mobile industry standards, the carriers and compliance groups can take several remedial steps, including suspending the short code for a period of time or terminating the short code entirely.

### The Defendants and Their Companies

12.    At all times relevant to this Indictment, DARCY WEDD, FRASER THOMPSON, and CHRISTOPHER GOFF, the defendants, were employed by a mobile aggregator based in the United States (the "U.S. Mobile Aggregator"). WEDD was the Chief Executive Officer ("CEO"), THOMPSON was the Executive Vice President of Operations, and GOFF was an Account Manager for the U.S. Mobile Aggregator.

13.    At all times relevant to this Indictment, MICHAEL PEARSE and YONGCHAO LIU, a/k/a "Kevin Liu," the defendants, were employed by a digital content provider and mobile aggregator based in Australia (the "Australian Mobile Aggregator"). PEARSE was the CEO and LIU was a Java Development Engineer for the Australian Mobile Aggregator.

14.    At all times relevant to this Indictment, YONG JASON LEE, the defendant, was a computer programmer employed by a digital content provider based in the United States that offered Premium SMS services to mobile phone customers ("U.S. Content Provider-1"). LEE was the Chief Technology Officer for U.S. Content Provider-1.

15.    At all times relevant to this Indictment, EUGENI TSVETNENKO, a/k/a "Zhenya," the defendant, ran at least two different

digital content providers based in Australia that offered Premium SMS services to mobile phone customers ("Australia Content Provider-1" and "Australia Content Provider-2"; collectively the "Australia Content Providers").

16.     At all times relevant to this Indictment, FRANCIS ASSIFUAH, a/k/a "Francis Assif," the defendant, was the CEO of a digital content provider based in the United States that offered Premium SMS services to mobile phone customers ("U.S. Content Provider-2").

## The Scheme to Auto-Subscribe Consumers through the U.S. Mobile Aggregator

### *Auto-Subscribing by U.S. Content Provider-1*

17.     In or about 2011, a co-conspirator not named as a defendant herein, who was the CEO of U.S. Content Provider-1 ("CC-1"), decided to begin auto-subscribing mobile phone users to U.S. Content Provider-1's Premium SMS services in order to boost U.S. Content Provider-1's sagging revenues.

18.     To do this, CC-1 needed a way to make it appear that the consumers who were auto-subscribed had actually agreed to be billed for the Premium SMS service, in the event that a mobile carrier or one of the industry compliance groups conducted an audit of the short code subscriptions.  Accordingly, CC-1 approached MICHAEL PEARSE and YONGCHAO LIU, a/k/a "Kevin Liu," the defendants, and asked

them to build a computer program that could spoof the required consumer authorizations - i.e., a program that could generate the text message correspondence that one would ordinarily see with genuine double opt-in verifications. PEARSE and LIU agreed to build the program (the "Auto-Subscription Platform"), which was operational by in or about the middle of 2011.

19. Before U.S. Content Provider-1 could begin auto-subscribing consumers, CC-1 needed a large volume of mobile phone numbers to run through the Auto-Subscription Platform. Accordingly, in or about July 2011, CC-1 approached CHRISTOPHER GOFF, the defendant, who was the Account Manager for U.S. Content Provider-1 at the U.S. Mobile Aggregator. By virtue of his position at the U.S. Mobile Aggregator, GOFF had access to large quantities of mobile phone numbers. GOFF agreed to provide large batches of phone numbers to CC-1 in exchange for payment. GOFF subsequently emailed two initial batches of mobile phone numbers to CC-1 in or about July 2011, and emailed additional batches of numbers to CC-1 on several occasions up through mid-2012. In total, GOFF sent CC-1 hundreds of thousands of phone numbers for the purpose of auto-subscribing consumers.

20. Throughout the summer of 2011, CC-1, MICHAEL PEARSE, and YONGCHAO LIU, a/k/a "Kevin Liu," the defendants, ran the phone numbers provided by CHRISTOPHER GOFF, the defendant, as well as

others, through the Auto-Subscription Platform and billed the subscriptions through mobile aggregators, including the U.S. Mobile Aggregator. In or about September 2011, executives at the U.S. Mobile Aggregator - including the CEO, DARCY WEDD, the defendant - noticed that the data for one of U.S. Content Provider-1's short code campaigns indicated non-compliance and raised the issue with CC-1 and another co-conspirator not named as a defendant herein, who was the Director of Global Sales for U.S. Content Provider-1 ("CC-2").

21. As a result, in or about October 2011, CC-1 met with DARCY WEDD, the defendant, in San Diego, California. At that meeting, CC-1 told WEDD, in sum and substance, that CC-1 wanted to auto-subscribe consumers through the U.S. Mobile Aggregator, and needed WEDD's help to do so. CC-1 further told WEDD, in sum and substance, that CC-1 needed additional phone numbers and short codes to facilitate the auto-subscribing. WEDD agreed to assist CC-1 with auto-subscribing in exchange for an up-front payment of approximately $100,000 and a percentage of the auto-subscription proceeds. WEDD further told CC-1, in sum and substance, that another co-conspirator not named herein, who was the Vice President of Compliance and Consumer Protection for the U.S. Mobile Aggregator ("CC-3"), would provide phone numbers to CC-1 and that all payments needed to go through CC-3. WEDD later received his portion of the payments from CC-1 via CC-3.

22. Shortly after the meeting in San Diego, in or about October 2011, CC-1 sent CC-2 to meet with CC-3 at the U.S. Mobile Aggregator's headquarters in Los Angeles, California. At that meeting, CC-2 gave CC-3 a portion of the $100,000 up-front payment in cash, and in return CC-3 gave CC-2 a thumb drive containing a large number of additional mobile phone numbers to be used to auto-subscribe consumers through the U.S. Mobile Aggregator. CC-3 provided additional batches of phone numbers to CC-1 and CC-2 on several occasions up through mid-2012.

23. CC-1 received the numbers from CC-2 and passed them to the Chief Technology Officer of U.S. Content Provider-1, YONG JASON LEE, a/k/a "Jason Lee," the defendant. It was LEE's responsibility, among other things, to verify that the phone numbers were still valid and active, and to sort and filter the numbers to make it easier to run them through the Auto-Subscription Platform. After LEE performed these functions, CC-1 sent the numbers to MICHAEL PEARSE, and YONGCHAO LIU, a/k/a "Kevin Liu," the defendants, to be run through the Auto-Subscription Platform.

24. CC-1 and U.S. Content Provider-1 auto-subscribed hundreds of thousands of phone numbers through the U.S. Mobile Aggregator, and generated millions of dollars of revenue, through in or about mid-2013.

25. In an effort to protect the auto-subscription revenue

-11-

generated by U.S. Content Provider-1, several of the co-conspirators took steps to conceal the fraud scheme from the mobile carriers and mobile industry compliance groups. For example:

a.   CC-3 helped CC-1, PEARSE, and LIU correct errors in the Auto-Subscription Platform that raised red flags in the U.S Mobile Aggregator's short code monitoring system. Among other things, PEARSE and LIU modified the Auto-Subscription Platform to randomize the timing of the text messages it generated – which were supposed to appear as if they were generated by actual consumers opting-in to the Premium SMS service – in a way that made them appear human-driven, not computer-driven. The goal was to make the subscriptions appear natural in order to avoid short code audits entirely or to minimize their severity.

b.   CC-1 and CC-2 also purchased so-called "blacklists" and "ninja lists" from CC-3 and another co-conspirator not named as a defendant herein, who was the Senior Vice President of Business Development at the U.S. Mobile Aggregator ("CC-4"). These lists included phone numbers belonging to executives at the mobile carriers and people at the mobile industry compliance groups, who could initiate an audit if they noticed suspicious or non-compliant activity on a particular short code – e.g., if their phone numbers were charged for a Premium SMS service that they had not authorized.   CC-1 ensured that all of the phone numbers on the

"blacklists" and "ninja lists" were removed from the list of phone numbers to be auto-subscribed before running the numbers through the Auto-Subscription Platform. CC-1 and CC-2 paid CC-3 and CC-4 approximately $10,000 for each "blacklist"/"ninja list," which were updated approximately each month. These payments were typically in cash and were often sent to CC-3 and CC-4 through the mail.

c.     CC-1 and CC-2 also paid CC-4 to obtain additional short codes on an expedited basis, which CC-1, CC-2, and PEARSE registered with companies that they controlled, but that were not affiliated with the Content Provider. This was done to spread out the auto-subscribing among different short codes and different corporate entities in order to reduce the possibility that the full scope of the scheme would be detected by mobile phone carriers, mobile compliance groups, and/or consumers. It also ensured that if one short code were suspended or terminated, other short codes would remain operational to continue auto-subscribing consumers.

d.     CC-3 also offered to use CC-3's influence with employees at the mobile carriers who handled short code audits to mitigate any problems that arose. For example, CC-3 had a contact at one of the major mobile phone carriers ("Mobile Carrier-1") whom CC-3 had paid in the past to receive favorable treatment ("Mobile Carrier-1 Employee"). CC-3 offered to use CC-3's influence with Mobile Carrier-1 Employee, in exchange for a fee of several thousand

dollars, to remove suspensions or terminations of the Content Provider's short codes at Mobile Carrier-1.

e. WEDD, CC-3, and another co-conspirator not named as a defendant herein ("CC-5") also provided false and misleading responses to audits requested by the mobile phone carriers and industry compliance groups in order to conceal their auto-subscription scheme.

26. Several of the co-conspirators also took steps to conceal their own involvement in the fraud scheme. For example:

a. CC-1 paid MICHAEL PEARSE, the defendant, his share of the proceeds to several nominee companies controlled by PEARSE that were located in the United States, Hong Kong, Australia, and New Zealand, among other places. Similarly, CC-1 paid CHRISTOPHER GOFF, the defendant, his share of the proceeds to a nominee company that GOFF controlled. To conceal the purpose of the payments, PEARSE and GOFF sent false invoices from their nominee companies to U.S. Content Provider-1 requesting payment for services rendered that, in fact, had never been provided.

b. CHRISTOPHER GOFF, the defendant, and CC-3 also did not use their work email addresses to correspond with CC-1 about the auto-subscription scheme. Instead, they used personal email addresses and/or email addresses associated with their nominee companies.

-14-

### *Auto-Subscribing by ASSIFUAH and U.S. Content Provider-2*

27. In or about early 2012, CC-4 approached CC-3 and asked to participate more actively in the auto-subscription scheme. CC-4 told CC-3, in substance and in part, that CC-4 was friends with FRANCIS ASSIFUAH, a/k/a "Francis Assif," the defendant, who was a former employee of the U.S. Mobile Aggregator, and who had since left to run a content provider ("U.S. Content Provider-2"). CC-4 proposed to CC-3, in substance and in part, that the two of them begin auto-subscribing customers with ASSIFUAH and U.S. Content Provider-2. CC-3 agreed to provide CC-4 with a small number of phone numbers to forward on to ASSIFUAH to auto-subscribe.

28. In or about February 2012, with the assistance of CC-4, FRANCIS ASSIFUAH, a/k/a "Francis Assif," the defendant, signed a contract with the U.S. Mobile Aggregator on behalf of U.S. Content Provider-2, which allowed U.S. Content Provider-2 to solicit and bill mobile phone customers for its Premium SMS services through the U.S. Mobile Aggregator's billing platform. According to the contract, U.S. Content Provider-2 was entitled to a percentage of the proceeds from the sale of these services.

29. In or about early April 2012, CC-4 sent an email from to FRANCIS ASSIFUAH, a/k/a "Francis Assif," the defendant, which attached Excel files containing phone numbers to be used by ASSIFUAH to auto-subscribe consumers through the U.S. Mobile Aggregator.

CC-4 also sent ASSIFUAH additional emails providing instruction on how to properly auto-subscribe the phone numbers without getting caught.

30. Shortly thereafter, FRANCIS ASSIFUAH, a/k/a "Francis Assif," the defendant, began auto-subscribing the numbers he had been given by CC-3 and CC-4 through the U.S. Mobile Aggregator. Almost immediately, CC-3, who was tracking the message logs and the subscription data for U.S. Content Provider-2's short codes at the U.S. Mobile Aggregator, noticed red flags with ASSIFUAH's subscription data that might lead to an audit. Accordingly, CC-3 sent an email to CC-4 explaining the problems with the data so that CC-4 could discuss them with ASSIFUAH. CC-4 later forwarded CC-3's email to ASSIFUAH and talked to ASSIFUAH about the red flags in an attempt to fix them. Ultimately, ASSIFUAH could not fix the problems and U.S. Content Provider-2 stopped auto-subscribing consumers after a period of several weeks.

31. In or about June 2012, the U.S. Mobile Aggregator paid U.S. Content Provider-2 approximately $190,000 for its portion of the revenue generated by U.S. Content Provider-2's short code subscriptions for the month of May 2012, which represented proceeds derived from auto-subscriptions. Shortly thereafter, FRANCIS ASSIFUAH, a/k/a "Francis Assif," the defendant, caused a check in the amount of approximately $150,000 to be sent from U.S. Content

Provider-2's bank account to the bank account of a nominee company controlled by CC-4. The purpose of the payment was to reimburse CC-3 and CC-4 for funds they had advanced to ASSIFUAH to create an auto-subscription platform at U.S. Content Provider-2 and to pay CC-3 and CC-4 their cut of the fraud proceeds. CC-3 and CC-4 divided the money among themselves.

32. In order to conceal their involvement in the fraud scheme, FRANCIS ASSIFUAH, a/k/a "Francis Assif," the defendant, as well as CC-3 and CC-4, corresponded with each other using personal email addresses, as opposed to work email addresses.

33. In total, FRANCIS ASSIFUAH, a/k/a "Francis Assif," the defendant, received over $600,000 in gross payments from the U.S. Mobile Aggregator, a significant portion of which came from auto-subscription proceeds.

## *Auto-Subscribing by TSVETNENKO and the Australia Content Providers*

34. In or about early 2012, DARCY WEDD and FRASER THOMPSON, the defendants, along with CC-3 and CC-4, had several discussions about how to increase revenues at the U.S. Mobile Aggregator, which were flagging because Premium SMS services had become less profitable. Among other things, WEDD, THOMPSON, CC-3, and CC-4 agreed to allow EUGENI TSVETNENKO, a/k/a "Zhenya," the defendant, to begin auto-subscribing consumers through the U.S.

Mobile Aggregator. TSVETNENKO ran several digital content providers and other mobile industry companies based in Australia and had been kicked off of the U.S. Mobile Aggregator's platform in the past due to suspicious subscription practices.

35. Over the course of several weeks, DARCY WEDD, the defendant, and CC-4 discussed the proposal with EUGENI TSVETNENKO, a/k/a "Zhenya," the defendant, and negotiated a revenue split, with approximately 70% of the auto-subscription proceeds going to TSVETNENKO and approximately 30% going to WEDD, CC-3, CC-4, and FRASER THOMPSON, the defendant.

36. To carry out the auto-subscription scheme, EUGENI TSVETNENKO, a/k/a "Zhenya," the defendant, created two new nominee companies, Australia Content Provider-1 and Australia Content Provider-2, which would offer the Premium SMS services and receive the proceeds of the fraud scheme from the U.S. Mobile Aggregator. FRASER THOMPSON, the defendant, and CC-4 purchased short codes for the Australia Content Providers, and CC-3 provided lists of phone numbers to TSVETNENKO to be auto-subscribed.

37. By at least in or about April 2012, EUGENI TSVETNENKO, a/k/a "Zhenya," the defendant, had started auto-subscribing consumers. Over the course of the next several months through in or about mid-2013, TSVETNENKO and the Australian Content Providers auto-subscribed hundreds of thousands of phone numbers through the

U.S. Mobile Aggregator, and generated millions of dollars of revenue.

38. DARCY WEDD, FRASER THOMPSON, and EUGENI TSVETNENKO, a/k/a "Zhenya," the defendants, as well as CC-3 and CC-4, devised a method of distributing the proceeds of the fraud scheme to conceal the nature and purpose of the money. Once the auto-subscription proceeds were paid from the U.S. Mobile Aggregator to the Australia Content Providers, TSVETNENKO would kick back approximately 30% to a nominee company controlled by CC-4, which would be apportioned roughly equally among WEDD, THOMPSON, CC-3, and CC-4. CC-4 would keep approximately 25% of the proceeds and send another 25% to a nominee company controlled by THOMPSON. CC-4 would also send approximately 50% of the proceeds to a nominee company controlled by CC-3, who would, in turn, keep 25% and send the remaining 25% to a nominee company controlled by WEDD. THOMPSON, CC-3, and CC-4 also created false invoices from their nominee companies requesting payment for services rendered that, in fact, had never been provided.

39. FRASER THOMPSON, the defendant, as well as CC-3 and CC-4, also concealed their involvement in the fraud scheme, by corresponding with each other using personal email addresses and/or email addresses associated with their nominee companies, as opposed to work email addresses.

-19-

## Statutory Allegations

40.     From at least in or about 2011, up to and including in or about 2013, in the Southern District of New York and elsewhere, DARCY WEDD, FRASER THOMPSON, CHRISTOPHER GOFF, MICHAEL PEARSE, YONGCHAO LIU, a/k/a "Kevin Liu," YONG JASON LEE, a/k/a "Jason Lee," EUGENI TSVETNENKO, a/k/a "Zhenya," and FRANCIS ASSIFUAH, a/k/a "Francis Assif," the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343, and mail fraud, in violation of Title 18, United States Code, Section 1341, to wit, WEDD, THOMPSON, GOFF, PEARSE, LIU, LEE, TSVETNENKO, and ASSIFUAH participated in a scheme to defraud wireless cellular telephone customers by charging customers for Premium SMS services without the customers' knowledge or authorization.

41.     It was a part and an object of the conspiracy that DARCY WEDD, FRASER THOMPSON, CHRISTOPHER GOFF, MICHAEL PEARSE, YONGCHAO LIU, a/k/a "Kevin Liu," YONG JASON LEE, a/k/a "Jason Lee," EUGENI TSVETNENKO, a/k/a "Zhenya," and FRANCIS ASSIFUAH, a/k/a "Francis Assif," the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and

promises, would and did transmit and cause to be transmitted by means
of wire, radio, and television communication in interstate and
foreign commerce, writings, signs, signals, pictures, and sounds for
the purpose of executing such scheme and artifice, in violation of
Title 18, United States Code, Section 1343.

42. It was a further part and an object of the conspiracy
that DARCY WEDD, FRASER THOMPSON, CHRISTOPHER GOFF, MICHAEL PEARSE,
YONGCHAO LIU, a/k/a "Kevin Liu," YONG JASON LEE, a/k/a "Jason Lee,"
EUGENI TSVETNENKO, a/k/a "Zhenya," and FRANCIS ASSIFUAH, a/k/a
"Francis Assif," the defendants, and others known and unknown,
willfully and knowingly, having devised and intending to devise a
scheme and artifice to defraud, and for obtaining money and property
by means of false and fraudulent pretenses, representations, and
promises, for the purpose of executing such scheme and artifice and
attempting so to do, would and did place in a post office and
authorized depository for mail matter, matters and things to be sent
and delivered by the Postal Service, and would and did deposit and
cause to be deposited matters and things to be sent and delivered
by private and commercial interstate carriers, and would and did take
and receive therefrom, such matters and things, and would and did
knowingly cause to be delivered by mail and such carriers according
to the directions thereon, and at the places at which they were
directed to be delivered by the persons to whom they were addressed,

-21-

such matters and things, in violation of Title 18, United States Code, Section 1341.

(Title 18, United States Code, Section 1349.)

## COUNT TWO

### (Wire Fraud)

The Grand Jury further charges:

43. The allegations set forth above in Paragraphs One through Thirty-Nine are realleged and incorporated by reference as if set forth fully herein.

44. From at least in or about 2011, up to and including in or about 2013, in the Southern District of New York and elsewhere, DARCY WEDD, FRASER THOMPSON, CHRISTOPHER GOFF, MICHAEL PEARSE, YONGCHAO LIU, a/k/a "Kevin Liu," YONG JASON LEE, a/k/a "Jason Lee," EUGENI TSVETNENKO, a/k/a "Zhenya," and FRANCIS ASSIFUAH, a/k/a "Francis Assif," the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, WEDD, THOMPSON, GOFF, PEARSE, LIU, LEE, TSVETNENKO, and ASSIFUAH participated in a scheme to defraud wireless cellular

-22-

telephone customers by charging customers for Premium SMS services without the customers' knowledge or authorization.

(Title 18, United States Code, Sections 1343 and 2.)

## COUNT THREE

### (Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

45.    The allegations set forth above in Paragraphs One through Thirty-Nine are realleged and incorporated by reference as if set forth fully herein.

46.    From at least in or about 2011, up to and including in or about 2013, in the Southern District of New York and elsewhere DARCY WEDD, FRASER THOMPSON, CHRISTOPHER GOFF, MICHAEL PEARSE, EUGENI TSVETNENKO, a/k/a "Zhenya," and FRANCIS ASSIFUAH, a/k/a "Francis Assif," the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit money laundering, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1957.

47.    It was a part and an object of the conspiracy that DARCY WEDD, FRASER THOMPSON, CHRISTOPHER GOFF, MICHAEL PEARSE, EUGENI TSVETNENKO, a/k/a "Zhenya," and FRANCIS ASSIFUAH, a/k/a "Francis Assif," the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce,

-23-

knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, willfully and knowingly would and did conduct and attempt to conduct such financial transactions which in fact involved the proceeds of specified unlawful activity, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), to wit, WEDD, THOMPSON, GOFF, PEARSE, TSVETNENKO, and ASSIFUAH distributed the proceeds of the fraud scheme alleged in Counts One and Two among themselves and the other co-conspirators by, among other things, causing funds to be transferred through the bank accounts of a series of nominee companies and companies held in the name of third parties, in order to conceal the nature and source of the payments that WEDD, THOMPSON, GOFF, PEARSE, TSVETNENKO, ASSIFUAH, and other co-conspirators received for their respective roles in the fraud scheme alleged in Counts One and Two.

48. It was further a part and an object of the conspiracy that DARCY WEDD, FRASER THOMPSON, CHRISTOPHER GOFF, MICHAEL PEARSE, EUGENI TSVETNENKO, a/k/a "Zhenya," and FRANCIS ASSIFUAH, a/k/a "Francis Assif," the defendants, and others known and unknown, in an offense involving and affecting interstate and foreign commerce,

-24-

willfully and knowingly would and did engage in and cause others to engage in a monetary transaction, as that term is defined in Title 18, United States Code, Section 1957(f)(1), in criminally derived property that was of a value greater than $10,000, in violation of Title 18, United States Code, Section 1957, to wit, WEDD, THOMPSON, GOFF, PEARSE, TSVETNENKO, and ASSIFUAH caused wire transfers, cash transfers, and/or check transfers of over $10,000 each to be sent to themselves and other co-conspirators, knowing that the funds transferred represented the proceeds of a criminal offense, to wit, the fraud scheme alleged in Counts One and Two.

(Title 18, United States Code, Section 1956(h).)

## FORFEITURE ALLEGATION AS TO COUNTS ONE AND TWO

49. As a result of committing one or more of the offenses alleged in Counts One and Two of this Indictment, DARCY WEDD, FRASER THOMPSON, CHRISTOPHER GOFF, MICHAEL PEARSE, YONGCHAO LIU, a/k/a "Kevin Liu," YONG JASON LEE, a/k/a "Jason Lee," EUGENI TSVETNENKO, a/k/a "Zhenya," and FRANCIS ASSIFUAH, a/k/a "Francis Assif," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, all property, real and personal, which constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts One and Two, including but not limited to the following:

a. All right and title and interest in shares of Kiz Toys Inc., issued in the name of Chris and Ryann Goff;

b. All right and title and interest of Michael J. Pearse in Advanced Technology Fund LLC;

c. All right and title and interest in the limited partnership interest in Blackwall Capital Holdings, LP in the name of Michael J. Pearse, equal to 1.5% based on a capital contribution of $150,000;

d. Any and all funds, up to and including $10,856.16, held in account number 2007375440 at Bank of America in the name of Michael Pearse, d/b/a Devine Elements, and all funds traceable thereto;

e. Any and all funds, up to and including $4,080.49, held in account number 2007876886 at Bank of America in the name of Michael Pearse, and all funds traceable thereto;

f. Any and all funds, up to and including $20,047.24, held in account number 2007876904 at Bank of America in the name of Michael Pearse, and all funds traceable thereto.

**FORFEITURE ALLEGATION AS TO COUNT THREE**

50. As a result of committing the offense alleged in Count Three of this Indictment, DARCY WEDD, FRASER THOMPSON, CHRISTOPHER GOFF, MICHAEL PEARSE, EUGENI TSVETNENKO, a/k/a "Zhenya," and FRANCIS ASSIFUAH, a/k/a "Francis Assif," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), all property, real and personal, involved in the offense alleged in Count Three, or any property traceable to such property, including but not limited to the following:

a. All right and title and interest in shares of Kiz Toys Inc., issued in the name of Chris and Ryann Goff;

b. All right and title and interest of Michael J. Pearse in Advanced Technology Fund LLC;

c. All right and title and interest in the limited partnership interest in Blackwall Capital Holdings, LP in the name of Michael J. Pearse, equal to 1.5% based on a capital contribution of $150,000;

d. Any and all funds, up to and including $10,856.16, held in account number 2007375440 at Bank of America in the name of Michael Pearse, d/b/a Devine Elements, and all funds traceable thereto;

e. Any and all funds, up to and including $4,080.49, held in account number 2007876886 at Bank of America in the name of Michael Pearse, and all funds traceable thereto;

f. Any and all funds, up to and including $20,047.24, held in account number 2007876904 at Bank of America in the name of Michael Pearse, and all funds traceable thereto.

## Substitute Asset Provision

51. If any of the property described above as being subject to forfeiture, as a result of any act or omission of DARCY WEDD, FRASER THOMPSON, CHRISTOPHER GOFF, MICHAEL PEARSE, YONGCHAO LIU, a/k/a "Kevin Liu," YONG JASON LEE, a/k/a "Jason Lee," EUGENI TSVETNENKO, a/k/a "Zhenya," and FRANCIS ASSIFUAH, a/k/a "Francis Assif," the defendants,

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b); Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461 to seek forfeiture of any other property of said defendants up to the value of the forfeitable property described above.

(Title 18, United States Code, Sections 981 and 982; Title 21, United States Code, Section 853; Title 28, United States Code, Section 2461.)

FOREPERSON

PREET BHARARA
United States Attorney

-28-

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

**DARCY WEDD,**
**FRASER THOMPSON,**
**CHRISTOPHER GOFF,**
**MICHAEL PEARSE,**
**YONGCHAO LIU,**
a/k/a "Kevin Liu,"
**YONG JASON LEE,**
a/k/a "Jason Lee,"
**EUGENI TSVETNENKO,**
a/k/a "Zhenya,"
**FRANCIS ASSIFUAH,**
a/k/a "Francis Assif,"

**Defendants.**

## SEALED SUPERSEDING INDICTMENT

S2 15 Cr. 616 (KBF)

(18 U.S.C. §§ 1343, 1349,
1956(h), and 2.)

_____
Preet Bharara
United States Attorney.

**A TRUE BILL**

_____
Foreperson.

7/20/16 Filed superseding indictment
Filed Arrest warrants
Judge Netburn